[Civ. No. 34379. Second Dist., Div. One. June 10, 1969.]

MARTIN FUSS, Petitioner, v. THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent; JEROME B. ROSENTHAL et al., Real Parties in Interest.

Pacht, Ross, Warne, Bernhard, Sears & Nutter, Harvey M. Grossman and Henry J. Shames for Petitioner.

No appearance for Respondent.

Rosenthal & Leon and Gerald H. Wiener for Real Parties in Interest.

THOMPSON, J.—Petitioner seeks a writ of mandate requiring the superior court to set aside its orders denying his discovery motions. The litigation in which the discovery is sought arises out of a long-term relationship between petitioner (Hunter)* and the law firm that acted as his counsel, business manager, financial adviser, bookkeeper and general custodian of his affairs. The real parties in interest are present and past members or associates of the firm and will be referred to collectively in this opinion as Rosenthal.

### BACKGROUND

In 1961, Rosenthal entered into a written contract terminable on 10 days' notice with Hunter, a motion picture producer and director. The contract obligated Rosenthal to represent Hunter in all legal matters except litigation and to advise him on his professional career and his business and financial matters. The law firm also agreed to marshal Hunter's funds, to maintain his bank accounts, to prepare budgets, to make "all proper expenditures" for his account, to perform income and estate tax service, to advise with respect to insurance, and to represent Hunter in dealing with others. In return, Hunter agreed to compensate Rosenthal in an amount equal to 10 percent of his earnings on existing contracts and those subsequently negotiated during the term of the agreement plus 10 percent of his pre-tax net income and gain from property acquired during the term of the agreement or concerning which Rosenthal rendered any service.

In 1965, Hunter and Rosenthal entered into another written agreement reciting that the earlier fee agreement "is to end automatically upon consummation of the MCA deal" and providing that Rosenthal's obligation to perform services was at an end. Hunter, by the agreement, assigned to Rosenthal certain payments of $300 a week due him from his controlled corporation together with 9 percent of designated additional payments. Rosenthal accepted those amounts in satisfaction of Hunter's financial obligation to the firm.

On July 16, 1968, Jerome Rosenthal directed a letter to Hunter stating that the firm had rendered services to Hunter

---

*Reporter's Note: Petitioner is known professionally as Ross Hunter.

after termination of the original contract. The July 16 letter offered to reinstate the terminated arrangement retroactively to 1965 in which case Hunter would owe Rosenthal $30,000 and stated that if Hunter did not agree to the retroactive reinstatement of the relationship with Rosenthal he would be billed in a "substantially" greater amount for services from July 5, 1965, to the date of the letter. Rosenthal's offer was refused by a letter from Hunter dated July 23, 1968. That letter stated that Hunter had decided to engage other counsel and another business manager. It denied that Rosenthal had been requested to perform any services in the period after July 5, 1965. On July 24, Rosenthal replied to Hunter in writing withdrawing the prior offer and enclosing a statement:

"For Services rendered

July 5, 1965 to June 23, 1968 $116,000.00"

On July 24, present counsel for Hunter replied to the letter and statement asking for the detail upon which the charge was based. Rosenthal answered on August 5, listing 18 categories of service. Counsel for Hunter responded on August 13 stating: "I think Ross is entitled to have the information of how much time was spent in connection with these matters, and what hourly rate or other method was used in arriving at the total." That letter was not answered. On August 27, 1968, Rosenthal filed a complaint against Hunter in three common counts seeking $150,000 and attached bank accounts of Hunter totaling $225,000. Hunter answered and cross-complained. The amended cross-complaint alleges five causes of action: for abuse of process arising out of a maliciously excessive attachment; for an accounting for the period July 1960 to July 1968; for return of books, records, and documents; for rescission and restitution; and for declaratory relief. Rosenthal filed an answer to the cross-complaint.

## DISCOVERY PROCEEDINGS IN THE TRIAL COURT

Hunter pursued discovery in the action by written interrogatories served pursuant to Code of Civil Procedure section 2030, by the taking of the deposition of Jerome Rosenthal, and by a motion to produce documents for inspection and copying pursuant to Code of Civil Procedure section 2031. A series of motions were made in the trial court with respect to those discovery procedures eventually resulting in the rulings now before us on Hunter's petition for writ of mandate.

**812**

On September 13, 1968, Hunter served 31 written interrogatories upon Rosenthal pursuant to Code of Civil Procedure section 2030.[1] Interrogatories 1 through 20 are framed with reference to the letter of August 5, 1968, from Rosenthal to Hunter's counsel listing 18 categories of service upon which Rosenthal's claim for compensation is based. The categories as listed in that letter are set forth in Appendix I to this opinion. They range from the specific "Preparation of Federal and State Tax Returns of Ross Hunter Publishing Co. for fiscal years ending November 30, 1965, 1966, and 1967" to the exceedingly vague, "General financial professional, and legal matters." Interrogatory 1 asks if any of the services so described were performed in the period from July 5, 1965, through August 27, 1966, and requests that if the answer is in the affirmative the services be described, the amount of charges allocable to them be given and the manner of computation of the amount be stated. Each of interrogatories 2 through 19 sets forth a category of service described in the letter and as to that category seeks the names and occupations of persons who performed the service, the dates of the services performed by each, and the amount of time and the nature of services performed by each. Those interrogatories also ask that Rosenthal state the amount of its claim allocable to the category of service. In the majority of interrogatories 1 through 20 the request is also made for a listing of documents, if any, "reflecting" services in the category. Typical interrogatories (numbers 3, 5, 6, 10, and 15) are quoted in Appendix II to this opinion. Interrogatory 20 asks for similar information with respect to any services not described in 1 through 18.

Rosenthal's response to each of interrogatories 1 through 20 (as amplified by further answers after the granting of an earlier motion for further response) was the same. It states that an answer to the interrogatory requires "a compilation, abstract, audit or summary of business records," and that such is not available but "may be compiled from relevant portions of the following: 1. Services Performed Sheets, 81 in number; 2. Services Performed Code; 3. Attorneys' Appointment Books; 4. Telephone and Appointment Call Sheets; 5. Legal files whose names are contained on the list attached . . .; 6. Employee Code; 7. Time Records; 8. Recollections of

---

[1] Only those interrogatories relevant to the instant petition for writ of mandate are discussed in detail.

persons who performed the work." The answer continues that "the pertinent and proper portions of . . . files not [previously] transmitted [to Hunter] . . . as well as pertinent and proper portions of Services Performed Sheets . . . [etc.] . . . may be examined . . . by Cross-Complainant's attorneys at reasonable times, upon reasonable notice; at the offices of Rosenthal and Green." Reference is also made by the answer to Exhibit W to the deposition of Jerome Rosenthal taken December 10, 1968. That exhibit is described in the preamble to the further answers to interrogatories as "a substantially accurate summation of material portions of services performed generally by persons who recorded their time for Ross Hunter from the period July 5, 1965, to and including March 31, 1968." Exhibit W consists of a series of schedules which purport to state the dates service was performed, the identity of the person performing the service, a description of the service, the amount of time spent, and the stated dollar value of the time. The information in Exhibit W is provided in the form of a code, a purported explanation of which is appended to the answer to interrogatories. There is then a disclaimer to the effect that "there may be some duplication or omission." The response includes a schedule of names of persons whose recollection might be helpful in supplying information missing from the answers.

With respect to manner of computation of fees allocable to each category of service, the answer states that charges for the services described were computed "by considering facts and data related to" 15 designated factors (the traditional items utilized in determination of attorneys' fees plus such matter as: "the overhead and other expense of the firm" and "the average yearly income of the firm"). It continues: "No one of these considerations was in itself controlling. All of the factors were used as guides in ascertaining the total value of all of the services rendered. After due consideration of all of the foregoing factors, a charge was made for the totality of services rendered. No specific amount was allocated to the particular services referred to in the Interrogatory. Services are not entirely reflected in time records and files, since some services were not recorded." The answer does not disclose the manner in which the factors described were used in determining Rosenthal's claim.

Interrogatory 21B asks whether Rosenthal made any demand or request for payment prior to July 16, 1968, and, if so, the detail of the demand or request. Rosenthal responded.

with the reference to a need for a compilation or summary and to the "pertinent and proper portions" of records and files utilized in response to interrogatories 1 through 20. The answer adds that "[e]ach was oral, substance was either Hunter's voluntarily stating that he expected to and would pay either on prior basis or on reasonable value . . . Conversations were face to face, telephone or both and took place between July 1965 and June 1968. There are no formal documents. As to some conversations there may be internal memos which will be supplied if determined necessary and not excludable under work product . . . Effort currently in progress to locate such memos as may exist. . . ."

Interrogatory 22A seeks the identifying date of records maintained by Rosenthal of compensation received from Hunter and his corporations for the period 1960 through 1968. Rosenthal answered: "Cash receipts journal, general ledgers, other related records. See Exhibit W, Schedules 1-1 through 1-8 and records supplied Defendant."

Interrogatory 24 asks for the identifying information with respect to time records pertaining to services rendered by Rosenthal to Hunter for the period after July 5, 1965, and of office records regarding the amount due, the dates of performance, and the nature of performance of services. The response refers to the answer to interrogatory 1 and to Exhibit W, schedules 1-1 through 1-8.

Interrogatory 28 seeks identifying data of written communications and conversations with respect to the 1960 fee agreement. Interrogatory 29 requests similar data with respect to the 1965 letter terminating that agreement. The response states that documents have been supplied to defendant and no others have been located. It states also "if continuing search discloses, will be supplied." The response is silent as to identifying data of conversations.

▉ Hunter moved in the trial court for an order compelling further answers to the interrogatories listed above. That motion was denied, and the application for writ of mandate which is now before us followed. We conclude that the petition is well taken with respect to the trial court's order denying further response to those interrogatories.

▉ The order of the trial court is reviewable by mandamus. Review is limited to a determination of whether the trial court abused the discretion vested in it by Code of Civil Procedure sections 2016 through 2036. That discretion, while broad, nevertheless must be exercised in the manner required

by law. (*Greyhound Corp.* v. *Superior Court,* 56 Cal.2d 355 [15 Cal.Rptr. 90, 364 P.2d 266]; *Carlson* v. *Superior Court,* 56 Cal.2d 431 [15 Cal.Rptr. 132, 364 P.2d 308].) We find an abuse of discretion in the order denying Hunter's motion for further responses to interrogatories by reason of the failure of the answers given to respond to the interrogatories posed in the manner required by the statute.

Interrogatories 1 through 21 and 24 were answered in part by resorting to the mode of response permitted by subparagraph (c) of Code of Civil Procedure section 2030 which states: "When in order to answer an interrogatory it is necessary to make a compilation, abstract, audit or summary of the business records of a party, and such a compilation, abstract, audit or summary does not exist . . . [1] it shall be a sufficient answer to such interrogatory to so state and [2] to specify the records from which the answer may be derived or ascertained and to afford to the party by whom the interrogatory was proposed reasonable opportunity to examine, audit or inspect such records and to make copies thereof or compilations, abstracts or summaries therefrom."

There are two clear defects in the manner in which Rosenthal has attempted to respond to the interrogatories in the manner provided in Code of Civil Procedure section 2030, subparagraph (c). The response on its face belies its use as a complete answer to the interrogatory since one of the sources of information to which Hunter referred is "8. Recollections of persons who performed the work." Those recollections are not "records from which the answer may be derived or ascertained." The other deficiency in the response is its failure to afford reasonable opportunity to examine, audit and inspect records. The offer contained in the purported 2030 subdivision (c) answer provides access only to "pertinent and proper portions" of files and records. An opportunity to examine records and files which the opposing party to the litigation deems pertinent and proper is no opportunity at all for the purpose of civil discovery.

 The civil discovery statutes are "intended to accomplish the following results: (1) to give greater assistance to the parties in ascertaining the truth and in checking and preventing perjury; (2) to provide an effective means of detecting and exposing false, fraudulent and sham claims and defenses; (3) to make available, in a simple, convenient and inexpensive way, facts which otherwise could not be proved except with great difficulty; (4) to educate the parties in

advance of trial as to the real value of their claims and defenses, thereby encouraging settlements; (5) to expedite litigation; (6) to safeguard against surprise; (7) to prevent delay; (8) to simplify and narrow the issues; and, (9) to expedite and facilitate both preparation and trial." (*Greyhound Corp.* v. *Superior Court*, 56 Cal.2d 355, 376 [15 Cal. Rptr. 90, 364 P.2d 266].) ▮ Virtually every purpose of discovery is frustrated by a response which says that answers are available in files and records but that the answering party will produce only those files and records which he deems "pertinent and proper." (See *Brotsky* v. *State Bar*, 57 Cal.2d 287, 304 [19 Cal.Rptr. 153, 368 P.2d 697, 94 A.L.R.2d 1310].)

▮ The reference to Exhibit W in the response to interrogatories 1 through 20 and 24 does not remedy the deficiencies in the 2030 subdivision (c) answer. The exhibit is stated to be "a substantially accurate summation" and contains the disclaimer "there may be some duplication or omission." It does not purport to represent the interrogated party's present best and complete answer. The description of the content of the exhibit and the disclaimer render the answer valueless to the interrogating party who may seek at trial to use the response for impeachment or to use it in advance of trial for the purpose of evaluating Rosenthal's claim or for preparing a defense. Irrespective of the limitations placed upon it by the answer to interrogatories, Exhibit W is itself deficient as a response. It is not correlated to the categories of service adopted by Rosenthal in his letter of August 5, 1968, and some of the coded references within it are so general as to be meaningless without explanation. Finally, the response itself admits the inadequacy of the exhibit by its statement that some services were not recorded in the time records.

The textual portion of the response to interrogatories 1 through 20 with reference to the portion of Rosenthal's claim allocable to the various categories of service also is deficient. While it states no amount was actually allocated, it is not responsive as to what is allocable. The answer, while reciting factors considered, is for all practical purposes silent as to the method by which the amount claimed by Rosenthal was actually computed and as to the effect of those factors on that amount. Read in the context of the litigation, it does not serve the purposes of discovery. The uncontroverted facts are that Rosenthal had undertaken to serve not only as counsel to

Hunter but also to supervise all of his financial and professional affairs. Rosenthal had originally claimed $30,000. When that claim was rejected a statement of $116,000 was forwarded, and when that statement was rejected suit was filed for $150,000. If there was a basis for the computation of the $30,000, Hunter under the circumstances is entitled to know it to prepare to defend against the claim. If there was a basis for the $116,000 statement and for the $150,000 sought in the complaint, Hunter is entitled to know that also both for the purposes of defense and to enable him to evaluate his cross-complaint charging abuse of process for a maliciously excessive attachment.

The textual portion of the answer to interrogatory 21 is unresponsive. The interrogatory refers to demands from Rosenthal and is answered textually by vague references to statements by Hunter.

There are deficiencies also in the responses to interrogatories 22, 28, and 29. Interrogatory 22, which asks for the identifying data of records, is answered by a specification of "cash receipts journal" and "general ledger" plus "other related records." There is no way to tell what those related records are. Interrogatories 28 and 29 are not answered at all to the extent that they seek the identifying data of conversations.

 We reject as untimely the argument made by Rosenthal in its brief in opposition to the petition for writ of mandate that the interrogatories are objectionable.[2] An objection to an interrogatory must be interposed within the statutory time for response and, absent a showing of good cause for relief from default, cannot be considered, if made thereafter. (*Coy* v. *Superior Court*, 58 Cal.2d 210, 216 [23 Cal.Rptr. 393, 373 P.2d 457, 9 A.L.R.3d 678].) In the case at bench, no objection was asserted within the required time and no attempt has been made to establish good cause to be relieved of the failure.

We conclude that there is no basis for the exercise of the discretion of the trial court in a fashion to deny Hunter's motion for further response to interrogatories.

---

[2]The general tenor of the objection that the interrogatories are so burdensome as to be oppressive would have been unmeritorious even if timely. The burden asserted is that of compiling the data upon which Rosenthal's claim as a plaintiff is based. Most or all of that compilation must have been done prior to the filing of the complaint if the litigation was commenced in good faith.

## DEPOSITION QUESTIONS

 Two separate issues are raised by those portions of the petition for writ of mandate which question the trial court's denial of Hunter's motion to compel compliance with deposition procedures: (1) the failure or refusal of Jerome Rosenthal to answer questions put to him; and (2) the refusal of Rosenthal to permit documents to be marked for identification for the purposes of the deposition.

At the outset we note that while an objection was made to the question appearing at page 264 line 23 of the deposition the question was nevertheless answered. As to that question the petiton must be denied. We find no basis for the trial court's order denying response to the other questions identified in the motion. The questions identified as page 351 line 17; page 265 line 15; page 349 lines 16, 19, 22, and 26; page 350 lines 11, 17, and 19; page 437 line 23; and page 438 lines 3 and 20 were simply not responded to by Jerome Rosenthal either by intelligible answers or by an appropriate objection. We include as Appendix III typical examples of those deposition questions and answers. The questions identified as page 445 line 5, page 447 line 21, and page 449 line 6 were objected to as previously answered. Nowhere in its papers filed in the trial court or with us has Rosenthal attempted to point out where the previous answers were given.

 At the time the deposition was taken, Rosenthal refused to permit certain documents produced by it in response to a court order to be marked for identification. Its objection at the time was that the documents had been produced pursuant to a court order obtained by a motion made under Code of Civil Procedure section 2031 to produce documents for inspection and copying and that production for that statutory purpose does not require the producing party to permit the documents to be so marked. In the context of the original court order granting the motion to produce for inspection, the objection is not well taken. The original order required the documents to be produced at the time and place of the deposition of Jerome Rosenthal. It contemplated the use of those documents in connection with the deposition, a use which is frustrated if the documents cannot be marked for identification. The civil discovery statutes are to be given a practical interpretation consistent with their purpose to ease the course of litigation. To require, as Rosenthal argues, that where documents are produced at deposition pursuant to an order obtained pursuant to section 2031 the documents cannot

be marked for identification unless a subpoena duces tecum is obtained for the same documents is to adopt an impractical approach. The good cause showing prerequisite to the granting of a motion to produce for inspection is identical with that required for a subpoena duces tecum re deposition. The requirements of identification of documents and relevancy to the subject matter are also the same. Having met the requirements for obtaining documents by one statutory method there is no reason to require that a party make an identical showing under another statute to secure the same material.

Rosenthal now argues in opposition to the petition for writ of mandate that it will be deprived of the use of the documents if the originals are marked for identification and lodged with the deposition. That argument, while possibly the proper subject of a motion to the trial court for a protective order pursuant to Code of Civil Procedure section 2019 permitting Rosenthal to retain the documents after they are marked, is not a valid objection to the process of marking the documents at deposition.

We conclude that there is no basis for the exercise of the discretion of the trial court in a fashion denying Hunter's motion to compel answers to questions at deposition (with the exception of the question appearing at page 264 line 23) and his motion to compel Rosenthal to permit documents to be marked for identification.

MOTIONS TO PRODUCE DOCUMENTS FOR INSPECTION

Two motions to produce for inspection are involved in the petition for writ of mandate: (1) Hunter's motion granted by the trial court on November 29, 1968; and (2) Hunter's motion to produce other documents for inspection filed January 8, 1969, and denied on February 5, 1969.

The trial court on November 29, 1968, granted a motion by Hunter to compel Rosenthal to produce documents pursuant to Code of Civil Procedure section 2031. The order required the production to occur at the time and place of Jerome Rosenthal's deposition set for December 10, 1968. At that time Rosenthal directed Hunter's counsel to 10 large cardboard boxes stating that the documents were either somewhere in those boxes or in an adjoining file room. Specific demand was made by Hunter for time summaries ordered produced by the November 29 ruling. Rosenthal refused to participate in a search of the boxes. Hunter then moved for a further order of court to require Rosenthal to segregate the

documents originally ordered produced from other documents in the boxes and the file room. His moving papers established the difficulty of finding the documents ordered produced in the mass of material to which he had been referred. Rosenthal made no evidentiary showing in opposition. Its counsel at argument on the motion did, however, represent that he would participate with Hunter's counsel in a review of all documents in the boxes and file room. The trial court denied the motion to segregate documents. We conclude that except as to the time summaries the trial court did not abuse its discretion in making the order.

Code of Civil Procedure section 2031 provides for an order to a party to produce designated documents for inspection and copying. The issue presented here—whether a party complies with such an order when he produces not only the designated documents but also others without segregating those designated—is one of first impression in California. We conclude that no all-encompassing rule can be promulgated to determine that issue. The question is basically one of fact: has the party against whom the order is issued acted so as to give the party obtaining the order reasonable access to the documents? The trial court on the record before it had no evidence from which it could conclude that reasonable access had been afforded. However, it did have the representation of Rosenthal's counsel that he would participate with Hunter's lawyer in arranging for that access as to all of the documents except the time summaries. Under these circumstances we do not find an abuse of discretion in the trial court's denial of the motion. The supervision of the conduct of discovery proceedings is peculiarly the province of the trial judge. We cannot assume at this point that if the joint efforts of counsel to segregate the documents come to naught the trial court will not permit the motion to be renewed or that it will act improperly upon the renewed motion.

■ The time summaries are in a different category. Rosenthal refused to participate in the effort to obtain them from the mass of documents. The general representation of counsel at hearing on the motion did not withdraw the refusal. The trial court on the record before it could not properly deny the motion as to these documents.

■ On January 28, 1969, Hunter moved for the production for inspection and copying of memoranda and memoranda of conversations between Rosenthal and others relating to the attachment levied by Rosenthal in the action and for

studies and reports relating to described oil and gas wells which were part of the investment program of Hunter supervised by Rosenthal. The showing of good cause pursuant to Code of Civil Procedure sections 2031 and 2036 was that the documents were needed to refresh Jerome Rosenthal's memory at deposition, he having stated that his recollection was incomplete. (See *Associated Brewers Distributing Co.* v. *Superior Court,* 65 Cal.2d 583 [55 Cal.Rptr. 772, 422 P.2d 332].) The showing in support of the motion was not rebutted. Under these circumstances, the trial court had no option but to grant it.

### SANCTIONS

■■ Hunter's petition for writ of mandate seeks an order requiring Rosenthal to pay the reasonable expenses including attorneys' fees incurred in obtaining the orders requiring further answers at deposition and to interrogatories. Those expenses and fees may be assessed against a party only when his refusal to answer a question at deposition or posed by an interrogatory is "without substantial justification" (Code Civ. Proc., § 2034, subd. (a)) or when it is "willful" (Code Civ. Proc., § 2034, subd. (d)). The ruling of the trial court denying Hunter's motions for further response to interrogatories and to require answers to deposition questions, while erroneous and an abuse of its discretion, establishes there was substantial justification for Rosenthal's refusals to furnish the discovery and that the refusals were not willful. (See *Fairfield* v. *Superior Court,* 246 Cal.App.2d 113 [54 Cal.Rptr. 721].) If we were to reach a contrary result we would in effect be penalizing a party for the error of the trial court by imposing upon him an obligation to reimburse his adversary for the cost of overturning that order. That portion of the petition which seeks to compel an order of the trial court imposing sanctions must be denied.

### PEREMPTORY WRIT

Let the peremptory writ of mandate issue requiring the respondent superior court to vacate its order made February 5, 1969, in the above entitled action denying in part "Motion of defendant and cross-complainant Martin Fuss, pka Ross Hunter to require Rosenthal to produce documents and to compel Jerome Rosenthal to answer questions" and "Motion of defendant and cross-complainant Martin Fuss pka Ross Hunter to require plaintiff and cross-defendants, Walter H. Harrison, Jerome B. Rosenthal, Harland N. Green, Rosenthal

& Green and Rosenthal, Cook & Green to further respond to certain interrogatories'' and to make a new order:

1. Requiring plaintiff and cross-defendant Rosenthal within a reasonable time set by the respondent court to give further response to the following interrogatories propounded by defendant Martin Fuss, pka Ross Hunter, and served upon Rosenthal on September 13, 1968:

Interrogatories 1-20 inclusive, 21 B, 22 A, 22 B,* 22 C,* 22 D,* 24, 25,* 26,* 27,* 28, 29, and 31.*

2. Requiring plaintiff and cross-defendant Rosenthal to produce, pursuant to respondent court's order of November 29, 1968, all time summaries relating to Ross Hunter.

3. Requiring the taking of the deposition of plaintiff and cross-defendant Rosenthal to be reconvened at a time and place set by the respondent court and further requiring Rosenthal to answer the following questions propounded upon the examination of Rosenthal during the taking of his deposition on December 10, 11, and 13, 1968:

(References are to the page and line number of the deposition [Volumes I through IV] of Jerome Rosenthal lodged with this court.)

| Item No. | Reference to Rosenthal Deposition | |
|---|---|---|
| | Page | Line |
| Former 42 | 351 | 17 |
| 133 | 265 | 15 |
| 134 | 349 | 16 |
| 135 | 349 | 19 |
| 136 | 349 | 22 |
| 137 | 349 | 26 |
| 138 | 350 | 11 |
| 139 | 350 | 17 |
| 140 | 350 | 19 |
| 141 | 437 | 23 |
| 142 | 438 | 3 |
| 143 | 438 | 20 |
| 144 | 445 | 5 |
| 145 | 447 | 21 |
| 146 | 449 | 6 |

4. Requiring Rosenthal to permit defendant and cross-complainant or his attorney to inspect and copy the following documents at a time and place set by the respondent court:

---

*Further response to these interrogatories was ordered by the trial court in its ruling reviewed on the instant petition.

(a) All correspondence and memoranda and memoranda of conversations between Rosenthal and any other person, firm or entity relating to the attachment in the present action or the effect of service of the summons and complaint in the present action upon Ross Hunter;

(b) All studies and reports relating to any of the following oil and/or gas wells: Caranchua No. 1, Caranchua No. 2, Caranchua No. 3, Vieux No. 1, Vieux No. 2, Vieux No. 3, Schweikart, Bailey, Culwell, Schulz, Bacon, Cochran-Kosberg, Chronicle A.

Petitioner is awarded his costs in these proceedings.

Wood, P. J., and Lillie, J., concurred.

A petition for a rehearing was denied July 8, 1969, and the opinion was modified to read as printed above.

### Appendix I

1. Tax planning for years 1965, 1966, 1967 and 1968, including analysis of tax effects of transactions considered, preparation of cash and tax projections at various times for each year showing cash/tax results;

2. Preparation of Federal and State Tax Returns for Ross Hunter for years 1965, 1966 and 1967;

3. Preparation of Federal and State Tax Returns for Ross Hunter Publishing Co. for fiscal years ending November 30, 1965, 1966 and 1967;

4. Transfer of information and documents and general coordination re acquisition by MCA of Ross Hunter Productions;

5. Coordination with MCA (including conferences with revenue agents and MCA personnel) re IRS audit of 1965 Federal Tax Return of Ross Hunter Productions, Inc. Audit included detailed factual and legal scrutiny of tax-free reorganization wherein MCA had acquired all the stock of Ross Hunter Productions, Inc. from Ross Hunter;

6. Coordination with MCA personnel re protest of State Franchise Tax Board proposed assessment re Ross Hunter Productions, Inc.

7. Conduct of IRS audit of Ross Hunter 1964 and 1965 personal tax returns. Audit of 1965 returns included legal and factual scrutiny of tax-free reorganization wherein Ross Hunter exchanged all his stock in Ross Hunter Productions, Inc. for stock in MCA.

APPENDIX I—(Cont.)

8. Consideration of many proposed investments, considering both economic and tax aspects.

9. Discussions with Ross Hunter with respect to his legal rights and obligations related to his contract of employment with Ross Hunter Productions, Inc., including advice as to restrictions, and non-restricted acts.

10. Planning and arranging the purchase and financing and subsequent sale of securities, including municipal bonds, convertible corporate debentures, corporate bonds and mutual funds; including conferences and correspondence with stock brokers, loan brokers, banks, custodial banks, etc.

11. Analysis (and conferences with reference to) of tax effects of alternative choices and methods as to disposition of MCA stock.

12. Investigation and solution of legal and practical problems of disposition of MCA stock acquired subject to investment letter in tax-free reorganization.

13. Arrangement for and supervision of sale of 10,000 shares MCA, re compliance disposition, and market influencing considerations.

14. Real Estate, oil and equipment leasing business and/or properties.

15. For Ross Hunter personally and for Ross Hunter Publishing Co.: Maintenance of records, receipt of bills and preparation of checks, receipt of income and deposit of funds, transfers to/from accounts, photocopies of checks to send to client, preparation of monthly receipts and disbursements statements for client. Many telephone calls with Ross Hunter, client, with respect to the above items.

16. Receipt of and analysis of periodic reports from corporations and mutual funds in which client has interest and transmission of same to client with applicable comments.

17. Supervision and advice with respect to insurance claims.

18. General financial, professional, and legal matters.

APPENDIX II

*Interrogatory 3.* Paragraph 2 of the August 5, 1968, letter states as follows:

"Preparation of Federal and State Tax Returns for Ross Hunter for years 1965, 1966 and 1967;"

APPENDIX II—(Cont.)

A. As to said Paragraph 2, describe in detail all services therein referred to for the year 1965.

1. State the names and occupations of all persons who performed such services and as to each such person state the dates of his services, amount of time spent thereon and nature of services performed.

2. State the amount of Rosenthal's charges allocable to such services and the manner in which said amount was computed.

B. As to said Paragraph 2, describe in detail all services therein referred to for the year 1966.

1. State the names and occupations of all persons who performed such services and as to each such person state the dates of his services, amount of time spent thereon and nature of services performed.

2. State the amount of Rosenthal's charges allocable to such services and the manner in which said amount was computed.

C. As to said Paragraph 2, describe in detail all services therein referred to for the year 1967.

1. State the names and occupations of all persons who performed such services and as to each such person state the dates of his services, amount of time spent thereon and nature of services performed.

2. State the amount of Rosenthal's charges allocable to such services and the manner in which said amount was computed.

*Interrogatory 5.* Paragraph 4 of the August 5, 1968, letter states as follows:

"Transfer of information and documents and general coordination re acquisition by MCA of Ross Hunter Productions;"

A. As to said Paragraph 4, describe in detail all services therein referred to.

B. State the names and occupations of all persons who performed such services and as to each such person state the dates of his services, amount of time spent thereon and nature of services performed.

C. Were said services reflected in any documents? If so, list such documents in the manner set forth in Item 2 of the Prefatory Statement.

D. State the amount of Rosenthal's charges allocable to

APPENDIX II—(Cont.)

such services and the manner in which said amount was computed.

*Interrogatory 6.* Paragraph 5 of the August 5, 1968, letter states as follows:

"Coordination with MCA (including conferences with revenue agents and MCA personnel) re IRS audit of 1965 Federal Tax Return of Ross Hunter Productions, Inc. Audit included detailed factual and legal scrutiny of tax-free reorganization wherein MCA had acquired all the stock of Ross Hunter Productions, Inc. from Ross Hunter;"

A. As to said Paragraph 5, state the names and occupations of all persons who performed the services therein referred to, and as to each such person state the dates of his services and the amount of time spent thereon.

B. State the amount of Rosenthal's charges allocable to such services and the manner in which said amount was computed.

C. List all conferences referred to in said Paragraph 5 of the August 5, 1968, letter and with respect to each such conference state:

1. The date thereof;
2. The names of the persons present;
3. The amount of time spent.

*Interrogatory 10.* Paragraph 9 of the August 5, 1968, letter states as follows:

"Discussions with Ross Hunter with respect to his legal rights and obligations related to his contract of employment with Ross Hunter Productions, Inc., including advice as to restrictions, and non-restricted acts."

A. As to said Paragraph 9, list all of the discussions therein referred to and with respect to each such discussion state:

1. The date thereof;
2. The names of the persons present;
3. The amount of time spent;
4. Were said discussions reflected in any documents? If so, list such documents in the manner set forth in Item 2 of the Prefatory Statement.

B. State the amount of Rosenthal's charges allocable to the services referred to in said Paragraph 9 of the August 5, 1968 Letter and the manner in which said amount was computed.

*Interrogatory 15.* Paragraph 14 of the August 5, 1968, letter states as follows:

APPENDIX II—(Cont.)

"Real Estate, oil and equipment leasing business and/or properties;"

A. As to said Paragraph 14, list all of the "real estate, oil and equipment leasing business and/or properties" therein referred to, and with respect to each:

1. Describe in detail all of the services referred to in said Paragraph 14 of the August 5, 1968 Letter.

2. State the names and occupations of all persons who performed such services and as to each such person state the dates of his services, amount of time spent thereon and nature of services performed.

3. Are said services reflected in any documents? If so, list such documents in the manner set forth in Item 2 of the Prefatory Statement.

B. State the amount of Rosenthal's charges allocable to the services referred to in said Paragraph 14 of the August 5, 1968 Letter and the manner in which said amount was computed.

APPENDIX III

" . . . . . . . . . . . .

Q. Item 39. Who made the determination that the reasonable value of the services performed, which are the subject of Count 1 of the Complaint in this action, was not less than $150,000?

A. I believe—I think I discussed it with Mr. Green, as I believe I earlier testified, and I discussed it, as I said, with Mr. Guilford, and to the extent that I had the information before me, it was I then in that way, or thus in concert with others, who made that computation or determination of the reasonable value of $150,000 or more.

Q. How did you arrive at that particular figure?

A. By considering all of the elements that I related in turn to Mr. Guilford, as I told you.

Q. Will you describe for us the process by which you reached that particular dollar figure?

A. I have just done so.

Q. Did you make any computation in arriving at the figure of $150,000?

A. Yes, sir, I arrived at a total by considering the factors I have just stated.

Q. Describe the computation by which you arrived at that figure.

APPENDIX III—(Cont.)

A. I don't know how to give you a further answer. I can't describe the computation as such since there was nothing done that would lead to a specific figure of $150,000 or more; rather, all of the elements concerned that I have earlier related a few moments ago were considered in arriving at the total.

Q. Did you just take the figure of $150,000 out of the air?

A. No, sir.

Q. Did you make any arithmetical computation in arriving at the figure of $150,000?

A. My answer is the same as to an arithmetical computation or a nonarithmetical computation. I arrived at the $150,000 by a general process which was, I repeat, a reference to all of the factors I have earlier stated.

Q. Please describe that process for us.

A. I have done so.

" . . . . . . . . . . .

Q. Item 42. Are you aware of any accounting having been rendered Mr. Hunter by your firm with respect to his affairs for any period subsequent to June 1968?

A. For any period? I don't know if I'm aware or not. I don't know.

" . . . . . . . . . .

Q. Aside from time sheets, are there any other records maintained by your firm reflecting time spent?

A. There may well be. As I have explained, there are a multiple of sources, and the principal, most regular, or routine one is the time sheet per se. But that's not the only one.

Q. What other records are maintained by your firm reflecting the amount of time spent on a particular item?

A. I believe I have answered that about three times now, Mr. Grossman, and I will await instruction from my counsel as to whether he will require you by his instruction to desist from this repetitive procedure or not.

MR. ROSEN: We are trying to be cooperative. This is a matter that you went into at length this morning several times. Now, I assume Mr. Rosenthal—correct me if I'm wrong —is saying that he is incorporating by reference his answers of this morning with regard to this entire subject matter which you went into exhaustively. Am I correct, Mr. Rosenthal?

THE WITNESS: That is correct. . . ."